426 P.2d 10

Justin J. MACKELPRANG and Frances C.
Mackelprang, Plaintiffs and Respondents,

v.

William MACKELPRANG and Hazel
J. Mackelprang, Defendants
and Appellants.

No. 10674.

Supreme Court of Utah.

March 27, 1967.

**64**

Patterson, Foley, Phillips & Gridley, C. C. Patterson, Ogden, for appellants.

Olsen & Chamberlain, Tex R. Olsen, Richfield, for respondents.

HENRIOD, Justice:

Appeal from a decision ordering specific performance of a contract wherein father, William, and mother, Hazel Mackelprang, 77 and 73 respectively, agreed to sell ranch property near Kanab, Utah, to their son, Justin ("Jet"), and daughter-in-law, Frances. Affirmed with no costs.

Jet was a Marine in 1956–57. During that time he corresponded with his parents in an effort to buy a half interest in the ranch, and it was agreed that he could do so for $30,000. Everyone knew that there was a $20,000 mortgage against *not only the property, subject of this litigation,* but against other property owned by the paterfamilias in Kanab and in Arizona.

Much was talked about in this case as to the actual value of the property and a proffer was made to show an offer by third parties of more than the agreed figure,—all of which was immaterial,—particularly in view of the fact that love and affection affectionately may have been a legitimate consideration, as an inducement for the written transaction. In 1962, Jet paid a substantial amount under the contract. Shortly thereafter Jet came home from the wars and immediately went into possession of the property and has operated it ever since, having paid about $18,000 toward purchase of the property,—findings of fact of the trial court amply sustained by the record.

In July, 1962, Jet orally said he would buy the whole property for the $30,000. A month and a half later, in September, this contention was confirmed by a written option to buy the *whole* ranch on such terms, which option was insisted upon and prepared by a federal government loan agency, sought out by Jet for funds to complete the purchase, and whose advice and instructions he followed religiously,—to all of which father William acquiesced. A year and a half before, and while Jet was fighting the heathens as a Marine captain, the elder Mackelprang contractors started a private war in the form of a divorce filed in 1961. Mrs. M accused Mr. M of a rejuvenated interest in and an indiscretion with one Madame X, for whom he had bought cows and hay. In that action it was pretty much evident that mother M insisted on William's aiding in getting Jet's loan approved by the loan agency in order to complete their contract with Jet. As a matter of fact, the

court ordered him to do it. He took an active part in procuring an abstract of title to accomplish the purpose, and told several creditors, including a benevolent but persistent mortgagee to "let Jet do it."

At the behest of somebody or other, Jet was appointed manager of the properties of the elder Mackelprangs. He made an accounting which to date has not been approved or disapproved, in which he claimed credit on his purchase of the ranch,—which, in this case, hardly can be evidence of anything at the time of appeal. Those claims are locked up in the bosom of another judge, in another case,—and not in that of the judge in the instant case. Thus, we cannot canvass the mind of the former, but only the evidence in that case reflecting defendants' own personal wishes to carry out the contract they agreed to with the military prodigal son, Jet.

It is significant at this juncture to point out that in the original written agreement of 1960, Jet was to make monthly payments of $150 for about 22 months, after which no cash payments were required, the balance to be paid out of the ranch's production, without interest, and that if defendants died, any balance on the contract entirely would be forgiven,—which of course would give estate planners and internal revenooers the seven-year itch, I suppose. Nonetheless, this possible happenstance did not occur, and this family and the planners and the revenooers were relieved of the discomfiture of such a malady when the September, 1962, option served as an antibiotic.

■ Jet purportedly in writing exercised the 1962 option in 1964, at the insistence of the federal loaning agency. Father M refused to execute a deed upon any tender of final payment of the amount due under the contract. We think Jet had exercised the option by signing it and going into possession immediately thereafter, or retaining possession, tilling the good earth, milking cows, paying taxes, and paying two-thirds of the purchase price. The option is a sufficient memorandum under the particular facts of this case to satisfy the statute of frauds. (Sec. 25–5–3, UCA 1953) in our opinion. Other memoranda, subscribed to by father M, would no doubt take it out anyway.

■ Appellants say Jet is not entitled to credit for payments he made on the mortgage. This poses a question: Why not? The sellers agreed to give a marketable title by warranty deed, free of encumbrances. This should answer appellants' first point on appeal.

The second point, that the option agreement of 1962 was insufficient to take the contract out of the statute of frauds, is answered by the observations hereinabove stated.

■ Thirdly, that Jet judicially is estopped to deny appellants' one-half interest

in the property is answered by appellants themselves, in conceding they agreed to another agreement providing for sale of, not one-half,—but the whole of the property.

The fourth point that appellants are entitled to damages against Jet for breach of the "first contract," seems to be answered by the former's concessions that there was a superseding contract,—and anyway, there is no evidence in the record to support the fourth point.

CROCKETT, C. J., and CALLISTER and TUCKETT, JJ., concur.

ELLETT, J., concurs in result.